**OFFIT KURMAN P.A.**
Jason A. Nagi
Stephen M. Forte
590 Madison Avenue, 6th Fl
New York, NY 10022
Tel. 929.476.0042
Jason.Nagi@OffitKurman.com
Stephen.Forte@OffitKurman.com
*Counsel for Plaintiff*
*Toorak Capital Partners LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TOORAK CAPITAL PARTNERS, LLC,<br><br>Plaintiff,<br><br>-against-<br><br>PRIVATE MONEY LENDERS, LLC; PML FACILITY, LLC; PML LENDER, LLC; PAYAM PEDRAM A/K/A PETER PEDRAM, and STEVE PALMER,<br><br>Defendants. | Civil Case No.<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Toorak Capital Partners LLC ("**Toorak**" or "**Plaintiff**"), by and through its counsel, Offit Kurman, PA, submits the instant Complaint against Defendants Private Money Lenders, LLC ("**PML**"), PML Facility, LLC ("**Facility**"), PML Lender, LLC ("**Lender**") (together with PML and Facility, the "**PML Entities**"), Payam Pedram a/k/a Peter Pedram ("**Pedram**") and Steve Palmer ("**Palmer**" together with Pedram and the PML Entities, collectively, the "**Defendants**"), and in support thereof, states as follows:

## INTRODUCTION

1.       Defendants engaged in a years-long, sophisticated scam that enabled them to sell the same mortgage loan to two, or more, different entities. Defendants acted as originating lenders,

1

making legitimate mortgage loans to entities across the country. As is the practice by other, legitimate originators, Defendants would sell these loans to loan aggregators—entities like Plaintiff, who purchase performing loans—or other entities that hold performing loans ("**Loan Buyers**").

2. When Loan Buyers purchase loans, the seller delivers: (i) all of the original loan documents (the "**Original Loan Docs**"), including the promissory note with an endorsement on the back or on a separate piece of paper, referred to as an allonge; and (ii) assignments for any of the loan documents that have been recorded in the land records in the county where the real property securing a mortgage loan or deed of trust is located (each an "**Assignment of Security Interest**" and collectively the "**Assignments of Security Interests**").

3. The Original Loan Docs and the Assignments of Security Interests exist for two separate purposes.

4. First, possession of the Original Loan Docs, most importantly the promissory note, commonly governs ownership of a loan, and gives the holder of the Original Loan Docs standing to enforce rights and remedies with respect to the collateral, such as in foreclosure actions.

5. Second, recording of the Assignments of Security Interests provides notice to the world of the new holder of a mortgage loan.

6. Over the course of four years, Defendants sold numerous loans to Plaintiff, which currently stands at approximately 70 Loans (the "**Loan Sales**").

7. In each instance, Defendants were required to provide an Assignment of Security Interest to Plaintiff.

8. In as many as 56 mortgage loans, totaling over $40 million in unpaid principal balance (collectively the "**Loans**" and individually a "**Loan**"), Defendants intentionally failed to deliver Assignments of Security Interests to Plaintiff, or delivered them in an unrecordable format.

2

9. Defendants relied on the combination of bulk sales, misleading emails and partial delivery of loan files to achieve their fraud and used delays between vendors and differing business information systems to extend their fraud.

10. After long periods of delays, or when borrower defaults occurred because legitimate borrowers paid off certain Loans directly to Defendants or to other Loan Buyers, Defendants used emails, telephone calls and text messages to: (i) provide false payoffs so that Defendants could fraudulently receive wires of money owed to Plaintiff or others; or (ii) deny that Defendants sent false payoffs for certain Loans.

11. Defendants also used electronic wires to: (i) transfer payments to Plaintiff; (ii) accept payments from Plaintiff owed pursuant to agreements between Plaintiff and Defendants; or (iii) defraud Plaintiff by causing unsuspecting borrowers to send Loan payoff proceeds to Defendants instead of Plaintiff.

12. The payments received by Defendants included: (i) payments by Plaintiff to PML Entities for the Loans; (ii) payments received by Defendants from unsuspecting borrowers, despite Defendants having sold the Loans to Plaintiff; (iii) interest payments made by Plaintiff to Defendants post-sale pursuant to the MLPAs (defined below) that required Plaintiff to wire a percentage of monthly payments to Defendants.

13. Plaintiff made all payments to Defendants by electronic wire transfer.

14. Defendants' repeated, consistent, and intentional failure to deliver recordable Assignments of Security Interests for the Loans was in furtherance of Defendants' scheme, permitting Defendants to obscure Plaintiff's ownership of the Loans.

15. Defendants' actions have: (i) prevented Plaintiff from recording its ownership of the Loans in the relevant county records nationwide; (ii) allowed Defendants to defraud Plaintiff and others by selling the same Loans to other Loan Buyers; and (iii) allowed Defendants to collect

3

and convert the full payoff of certain Loans which were owed to Plaintiff directly from unsuspecting borrowers.

16. Defendants' fraud resulted in at least one litigation claim against Plaintiff that Plaintiff must now defend, and will require Plaintiff to name other entities in at least one foreclosure action, delaying Plaintiff's pursuit of remedies for that Loan, and potentially all remaining Loans where a borrower defaults.

17. While Plaintiff continues to demand recordable Assignments of Security Interests from Defendants, and continues to defend itself or its position as a first lien mortgagee in various litigations, Defendants continue to refuse to cooperate leaving Plaintiff at risk of Defendants' continued perpetration of its fraudulent enterprise.

18. Defendants' actions have caused Plaintiff significant financial injury and continue to expose Plaintiff to potential future liability from unknown third-parties that may now or in the future be affected by Defendants' fraudulent actions, necessitating the filing of this Complaint.

19. While Plaintiff commenced an action against some of the Defendants in a separate proceeding in the Superior Court of New Jersey due to a breach of the MLPAs, Defendants' fraudulent enterprise and misconduct goes far beyond merely breaching the MLPAs.

## THE PARTIES

20. Plaintiff is a limited liability company formed under the laws of the State of Delaware.

21. Defendant PML is a limited liability company organized under the laws of Delaware and maintains its principal place of business at 8888 W. Olympic Blvd, Suite 200, Beverly Hills, CA 90211.

22. Defendant Facility is a limited liability company organized under the laws of Delaware and maintains its principal place of business at 8888 W. Olympic Blvd, Suite 200, Beverly Hills, CA 90211.

23. Defendant Lender is a limited liability company organized under the laws of Delaware and maintains its principal place of business at 8888 W. Olympic Blvd, Suite 200, Beverly Hills, CA 90211.

24. Pedram is, upon information and belief, a resident of the State of California.

25. Upon further information and belief, Pedram serves as the sole member and chief executive officer of the PML Entities.

26. Palmer is, upon information and belief, a resident of the State of California.

27. Upon further information and relief, Palmer is a high-level employee of the PML Entities and conspired and aided and abetted in the fraud committed by Pedram and the PML Entities.

28. Upon information and belief, Pedram and Palmer control the PML Entities and use them interchangeably with disregard to corporate formalities in order to perpetrate their fraudulent enterprise.

## JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 and because Defendants regularly conduct business in New York, have sold at least eight loans to Plaintiff governed by New York law, and secured by collateral located in the state of New York, and have transacted with other entities in the state of New York.

30. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district.

## FACTUAL BACKGROUND

### A. The Loans

31. Plaintiff and PML executed two separate Master Loan Purchase Agreements (collectively referred to herein as the "**MLPAs**"), dated January 19, 2021, and September 27, 2021, which governed the obligations and transactions concerning the Loans, as well as other loans acquired by Plaintiff from Defendants.

32. Since entering into the MLPAs, Toorak has purchased many mortgage loans from Defendants.

33. For each mortgage loan purchased, the MLPAs required that Defendants deliver to Plaintiff the Original Loan Docs and the Assignments of Security Interests in recordable form.

34. Defendants, however, repeatedly ignored or otherwise refused to provide such documents in the proper form in at least 56 separate instances.

### B. The Fraudulent Enterprise

35. As of the date of this Complaint, Toorak is missing original Assignments of Security Interests for the Loans. (a true and correct list of the Loans is attached hereto, and made a part of this complaint, as **Exhibit 1**.)

36. The failure and refusal of Defendants to execute recordable Assignments of Security Interests has impaired, and continues to impair, Plaintiff's interest in the Loans, as Plaintiff cannot record its ownership of the Loans in the public records.

37. Three loan transactions in particular exemplify the application of Defendants' enterprise, predicated on providing unrecordable Assignments of Security Interests to either sell the same loan to two different entities or to steal money owed to Plaintiff, who was the rightful holder of each loan.

### i. **The Norwood Loan**

38. Plaintiff purchased a mortgage loan from PML evidenced by a promissory note in the original principal amount of $357,000 and secured by real property with an address of 469 Norwood St., East Orange, NJ (the "**Norwood Loan**").

39. PML originated the Norwood Loan and intentionally delivered an unrecordable Assignment of Security Interest to Plaintiff, preventing Plaintiff from recording its ownership of the Norwood Loan in the records of the Essex County Clerk's office.

40. On or about July 9, 2024, Plaintiff stopped receiving monthly payments from the borrower, resulting in a default under the terms of the Norwood Loan.

41. In January 2025, Plaintiff contacted the Norwood borrower because the December 2024 loan payment had not been made.

42. By email dated January 29, 2025, an agent for the Norwood borrower advised Plaintiff that: (i) on July 9, 2024, the Norwood borrower had wired the amounts required to pay off the Norwood Loan directly to PML; and (ii) that the August, September, October, November and December ACH monthly payments were still being withdrawn from the Norwood borrower's account via the ACH process (the "**Norwood Wire Fraud Email Chain**") (a true and correct copy of the entire **Norwood Wire Fraud Email Chain** with attachments is attached hereto, and made a part of this complaint, as **Exhibit 2**.)

43. The Norwood Wire Fraud Email Chain, includes emails by and between Pedram, Palmer, PML and the title escrow company.

44. In the Norwood Wire Fraud Email Chain, Palmer emailed a fraudulent payoff letter from "Private Money Lenders LLC, Payoff Department" (the "**Fraudulent Norwood Payoff**") to the title escrow company, copying Pedram.

45. Plaintiff confronted Defendants with the Fraudulent Norwood Payoff during a telephone call on June 20, 2025, where Pedram insisted that PML had not provided a payoff statement or received any funds for the Norwood Loan.

46. Immediately thereafter, by email dated June 20, 2025, Plaintiff asked Pedram to confirm that Defendants had not stolen the payoff, as follows:

> the borrower and their title company are claiming funds were sent to PML based off the attached PML payoff and wire confirmation. For our records, please confirm that PML did not create this payoff, that the wire confirmation is not related to your account and that PML did not receive payoff funds for this loan.

(a true and correct copy of the email chain is attached hereto, and made a part of this complaint, as "**Exhibit 3**".)

47. Pedram knew his statements were false, were known by Pedram to be false when they were made to Plaintiff, and were made for Plaintiff to rely upon them for Defendants to continue to conceal their fraudulent acts.

48. Rather than put his lies in writing, however, Pedram responded that Defendants would buy back the Norwood Loan:

> We will purchase this one as well and deal with it on our end. Please provide a payoff good through July 15th.

(*Id.*)

49. To date, Defendants have failed to repurchase the Norwood Loan or reimburse Plaintiff for harm caused by Defendants' fraudulent conduct.

    ii.   **The 115 Washington Loan**

50. Plaintiff purchased a mortgage loan from Facility, evidenced by a promissory note in the original principal amount of $458,000.00, dated May 12, 2023, and secured by real property with an address of 115 Washington Boulevard, Oak Park, IL (the "**Washington Loan**").

8

51. Facility originated the Washington Loan and never delivered an Assignment of Security Interest to Plaintiff, preventing Plaintiff from recording its ownership of the Washington Loan in the records of the Cook County Clerk's office.

52. Although the electronic origination file provided by Defendants contained an assignment of mortgage from Facility to Plaintiff, signed by Pedram on behalf of Facility, dated May 16, 2023, and notarized on March 30, 2023, the original collateral file does not include the original Assignment of Security Interest.

53. As a result of Defendants' refusal to provide an original Assignment of Security Interest, an assignment of mortgage was recorded by another entity, Reigo by Meitav Dash US Investments LLC ("**Reigo**"), on March 20, 2024 (the "**Reigo Washington Assignment**"), which purported to assign the 115 Washington Loan from Facility to Reigo.

54. The purported effective date of the Reigo Washington Assignment was May 12, 2023; however, the Reigo Washington Assignment was not notarized until July 31, 2023—after the Washington Loan was sold to Plaintiff.

55. Plaintiff at all times serviced the Washington Loan through its loan servicer.

56. On or about September 11, 2024, the borrower for the Washington Loan paid Plaintiff the full amount of the indebtedness of the Washington Loan.

57. Several days thereafter, a release of lien was issued, which was recorded on November 1, 2024.

58. On February 21, 2025, an additional assignment of mortgage was recorded purporting to correct the Reigo Washington Assignment by substituting Credit Facility Lender, LLC as the assignee.

59. Upon information and belief, Credit Facility Lender, LLC is an affiliate, subsidiary or is otherwise related to Reigo.

60. Reigo has subsequently claimed that Plaintiff improperly accepted the payoff, has commenced foreclosure proceedings against the Washington Loan borrower Signature Affairs, Inc., and has named Plaintiff as a party to the foreclosure action asserting causes of action against Plaintiff for receiving the payoff of the Washington Loan, despite the fact that Plaintiff purchased the Washington Loan from Facility.

### iii. The 21 Bathgate Loan

61. Plaintiff purchased a mortgage loan from PML, evidenced by a promissory note in the amount of $1,050,000.00, dated November 9, 2022, secured by real property with an address of 21 Bathgate Rd., Wainscott, NY (the "**Bathgate Loan**").

62. PML originated the Bathgate Loan and intentionally excluded an original Assignment of Security Interest to Plaintiff, preventing Plaintiff from recording its ownership of the Bathgate Loan in the records of the Suffolk County Clerk's office.

63. Although the electronic origination file provided by Defendants contains an assignment of security interest to Plaintiff, the original collateral file does not include an original of that assignment.

64. After the Bathgate Loan went into default, Plaintiff made numerous demands that Defendants deliver the Assignment of Security Interest to Plaintiff in recordable form in connection with Plaintiff's anticipated foreclosure complaint, which Defendants refused to deliver.

65. On May 15, 2025, Plaintiff commenced a foreclosure action with respect to the Bathgate Loan in the Supreme Court, Suffolk County, and filed and recorded a notice of pendency.

66. On June 5, 2025, the Suffolk County recorder's office recorded an assignment of mortgage purporting to assign the Bathgate Loan from PML to Reigo (the "**Reigo Bathgate Assignment**"), which was notarized on January 7, 2025, and which purports to be effective as of

10

November 9, 2022. (a true and correct copy of Reigo Bathgate Assignment is attached hereto and made a part of this complaint, as **Exhibit 4**.)

67. Upon information and belief, Defendants directed the borrower to stop making payments to Plaintiff because Defendants were changing loan servicers and transferring the Loan to Reigo.

68. The Bathgate borrower claims that it made loan payments directly to Reigo, instead of Plaintiff, as a result of Defendants' instructions.

69. On June 13, 2025, Plaintiff's asset manager emailed Pedram advising Defendants of the discussion with the Bathgate borrower. (a true and correct copy of the email correspondence is attached hereto, and made a part of this complaint, as **Exhibit 5**.)

70. Pedram asserted that the Bathgate borrower's claims were "BS, we will deal with it next week after my wedding." (*Id.*)

71. After being confronted with the fraud by email, and having received no additional response, on June 20, 2025, Pedram used telephone communications to falsely claim that Reigo was a "credit facility that has gone out of business."

72. On the same day, rather than denying his false statement, Pedram circulated a responsive email stating, "We will purchase this note…" (*Id.*)

73. Pedram knew his statements regarding Reigo were false, were known by Pedram to be false when they were made to Plaintiff, and were made for Plaintiff to rely upon them for Defendants to continue to conceal their fraudulent acts.

74. Plaintiff demanded the repurchase of the Norwood Loan and the Bathgate Loan, and have demanded the execution and delivery of the Assignments of Security Interests for all of the Loans.

75. Defendants, however, have failed and refused to comply so that they may continue to perpetrate their fraud on Plaintiff and others.

## COUNT I
### FEDERAL CIVIL RICO, 18 U.S.C. § 1962(A) THROUGH (C)
**(Against all Defendants)**

76. Plaintiff incorporates by reference all of the preceding paragraphs as if more fully set forth herein.

77. Plaintiff is a "person" within the meaning of 18 U.S.C. 1961(3) and 18 U.S.C. 1964(c) and brings this action pursuant to 18 U.S.C. 1964(a) through (c) of the Racketeer Influenced and Corrupt Organizations Act (hereinafter "**RICO**").

78. Defendants are each a "person" within the meaning of 18 U.S.C. 1961(3).

**The Enterprise**

79. For the purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of the Defendants, including their respective officers, directors, employees, agents, and indirect subsidiaries (the "**Enterprise**").

80. The Enterprise was separate and distinct from the persons that constituted the Enterprise.

81. The Enterprise was primarily managed by Pedram, who organized the fraudulent enterprise and procured the involvement of the PML Entities. Each of the Defendants agreed to, and did, participate in the conduct of the Enterprise and carried out their roles using broad and independent discretion.

82. The companies and individuals that constitute the Enterprise were associated for the common purpose of defrauding Plaintiff and similar companies into an enterprise whereby Defendants would sell the same loan to more than one entity, or would direct loan payoff proceeds be paid to one of Defendants, rather than Plaintiff.

83. Upon information and belief, the Enterprise has operated since at least 2021 when PML entered into the MLPAs with Toorak.

**Pattern of Racketeering Activity**

84. At all times relevant, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity, as defined in RICO, 18 U.S.C. § 1961(5), by virtue of the conduct described herein.

85. The pattern of racketeering activity consisted of mail fraud and/or wire fraud in violation of 18 U.S.C. § 1341 and § 1343 in interstate commerce.

86. Defendants engaged in an intentional enterprise or artifice to defraud Plaintiff and other loan buyers to (a) buy Loans that Defendants no longer owned or (b) sell Loans without conveying proper Assignments of Security Interests.

87. As such, the Enterprise enabled Defendants to either sell the Loans to two separate entities or to receive payoff proceeds from borrowers in the place of Plaintiff or other unsuspecting Loan Buyers.

88. Defendants committed mail fraud and/or wire fraud by virtue of the false and misleading representations contained within the communications between Defendants and Plaintiff or the other Loan Buyers, as demonstrated by the email correspondence attached to the complaint, Reigo's lawsuit, the Reigo Washington Assignment, the Reigo Bathgate Assignment, and Defendants' representations to Plaintiff in telephone calls, which hid the true nature of the Enterprise.

89. Defendants would further this conduct by making false statements to Plaintiff once the Enterprise was at risk of becoming revealed, by claiming the Defendants would buy back the Loan at issue.

90. Defendants further committed mail fraud and wire fraud by virtue of the acceptance of monies via wire exchange for the fraudulently sold Loans and when Defendants accepted wire payments from Plaintiff pursuant to the MLPAs.

91. The mail and wire fraud was perpetrated by Defendants or their authorized agents, via instructions to carry out activities in furtherance of the fraud, material misrepresentations made to Plaintiff, and other Loan Buyers, and the negotiation, finalization, and notarization of documents.

92. It was reasonably foreseeable to Defendants that the mails and wires would be used in furtherance of the fraudulent enterprise, and the mails and/or wires were in fact used to further and execute the fraudulent enterprise.

93. The fraud would not have been possible had Defendants and their authorized agents, not used the mail and wire to send and receive the communications with Plaintiff or Defendants' other victims.

94. Plaintiff relied on Defendants' misrepresentations and omissions sent through electronic transmission, allowing Defendants to perpetrate their fraud against Plaintiff.

95. Had Defendants disclosed their fraudulent enterprise, Plaintiff would not have permitted the transactions in question and would have certainly ended all business dealings with Defendants.

96. The nature and pervasiveness of the Enterprise necessarily entailed frequent mail and/or wire transmissions. The precise dates of such transmissions cannot be alleged without access to the books and records of Defendants and their agents. However, Plaintiff generally alleges that such transmissions were repeated and regular, occurring before, during and after the negotiation of the MLPAs, which were also conducted in whole or in part via email.

97. By way of example, Defendants and Plaintiff negotiated and exchanged emails concerning the MLPAs over a period of weeks, primarily by email.

98. Subsequent to the closing of the MLPAs through early 2025, further transmissions were exchanged between Plaintiff and Defendants concerning Plaintiff's acquisition of specific Loans from Defendants.

99. For each Loan acquired by Plaintiff from Defendants under the MLPAs, Plaintiff would wire funds to Defendants to purchase the Loan and Plaintiff would also wire funds to Defendants when a borrower would make its monthly payment.

100. The foregoing examples are but a few instances of the pattern of Defendants' racketeering activity, consisting of mail and wire fraud violations.

101. For the purpose of furthering and executing their fraudulent enterprise, Defendants regularly caused Original Loan Docs to be placed in post offices or authorized depositories, or deposited or caused to be deposited Original Loan Docs to be sent or delivered by a private commercial interstate carrier.

102. For the purpose of furthering and executing the Enterprise, Defendants also regularly transmitted and caused writings and electronic data to be transmitted in interstate commerce by means of wire communication.

103. Defendants utilized the mails and wires for the purpose of furthering and executing the Enterprise.

104. Each postal and electronic transmission was incident to an essential part of the Enterprise.

105. Additionally, each postal and electronic transmission constituted a predicate act of mail fraud or wire fraud in that each transmission furthered and executed the Enterprise to defraud Plaintiff and other Loan Buyers.

106. Defendants each participated in the Enterprise knowingly, willfully and with a specific intent to defraud Plaintiff, and other Loan Buyers.

107. The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).

108. The predicate acts were not isolated events, but were related acts aimed at the common purpose and goal of committing fraud via the Enterprise.

109. Defendants were common participants in the predicate acts. Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive Plaintiff and other Loan Buyers.

**Injury to Plaintiff**

110. As a direct and proximate result of the violations of 18 U.S.C. § 1962(c) by Defendants, Plaintiff has been injured in its business and property within the meaning of 18 U.S.C. § 1964(c).

111. In particular, Plaintiff was injured by the inability to record its security interest in the Loans.

112. Plaintiff was injured each time Defendants sold a Loan to Plaintiff and another Loan Buyer, or when Defendants directed Loan borrowers to pay Defendants instead of Plaintiff, and when Defendants refused to include Assignments of Security Instruments for the Loans.

113. Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff for three times the damages sustained, plus costs of bringing this suit, including reasonable attorneys fees.

## COUNT II
### FEDERAL CIVIL RICO, 18 U.S.C. § 1962(D)
**(Against all Defendants)**

114. Plaintiff incorporates by reference all of the preceding paragraphs as if more fully set forth herein.

115. Defendants unlawfully, knowingly, and willfully conspired to commit activities prohibited by 18 U.S.C. § 1962(a)–(c) as described above, in violation of 18 U.S.C. § 1962(d). Defendants knew that they were engaged in a conspiracy to commit the predicate acts described above and knew that the predicate acts were part of such racketeering activity, and that participation and agreement was necessary to allow the commission of this pattern of racketeering activity.

116. Defendants all knowingly agreed to conduct or participate directly or indirectly in the conduct, management, or operation of the Enterprise.

117. Defendants' violation of 18 U.S.C. § 1962(d) directly, proximately, and foreseeably caused Plaintiff to suffer the injury described above.

## COUNT III
### FRAUD
**(against all Defendants)**

118. The foregoing allegations are incorporated by reference as though fully stated herein.

119. Defendants promised Plaintiff that they would assign their entire interests in the mortgage loans sold to Plaintiff, and that they would provide Plaintiff recordable Assignments of Security Interests.

120. Defendants made these promises without a present intent to perform.

121. On the contrary, Defendants sought to perpetrate a fraudulent enterprise whereby they would sell the same loan to multiple parties and would conceal this fraud from Plaintiff by

failing and refusing to include the Assignments of Security Interests in the package of Original Loan Docs mailed to Plaintiff.

122. Plaintiff reasonably relied on Defendants' misrepresentations. Defendants held themselves as professional lenders, and had, in fact, originated loans on numerous commercial and residential properties.

123. Plaintiff has been damaged by Defendants' fraudulent Enterprise. Specifically, Plaintiff has been unable to collect the payoff funds related to the Norwood Loan that Pedram and PML improperly converted. Further, Plaintiff has learned that Regio claims an interest to certain mortgage loans and has asserted claims against Plaintiff with respect to same.

124. The harm suffered by Plaintiff is the direct result of acts by PML that were willful, wanton, and malicious.

**WHEREFORE**, Toorak respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

(A) On Counts I and II against Defendants for violations of RICO in an amount to be determined at trial and including punitive damages, together with attorneys' fees and costs.

(B) On Count III against Defendants for fraud in an amount to be determined at trial, including attorneys' fees and costs.

## DEMAND FOR JURY TRIAL

Plaintiff Toorak Capital Partners LLC hereby demands a trial by jury on all issues so triable of right.

Dated: New York, New York
August 19, 2025

OFFIT KURMAN, P.A.

By:   /s/ Stephen M. Forte, Esq.
Jason A. Nagi
Stephen M. Forte
590 Madison Avenue, 6th Floor
New York, NY 10022
Tel. 929.476.0042
Jason.Nagi@OffitKurman.com
Stephen.Forte@OffitKurman.com
*Counsel for Plaintiff*
*Toorak Capital Partners LLC*

4927-8605-8581